**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| RAYTHEON COMPANY | § | |
| *Plaintiffs*, | § | Civil Action No. 2:15-CV-01554-JRG |
| | § | |
| v. | § | |
| | § | |
| CRAY, INC. | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion of Defendant Cray, Inc. ("Cray") to Transfer Pursuant to 28 U.S.C. § 1406(a). (Dkt. No. 256.) Having considered the Parties' submissions and the relevant authorities, and for the following reasons, the Court finds that the motion should be and is **DENIED**.

## I.      BACKGROUND

On September 25, 2015, Raytheon Company ("Raytheon") filed its Complaint against Cray, Inc., alleging infringement of four patents. (Dkt. No. 1.) Raytheon asserts that Cray has directly infringed at least two of Raytheon's patents by using, selling, or offering to sell high performance computing ("HPC") products or supercomputer systems to customers within the State of Texas and the Eastern District of Texas. (Dkt. No. 1 ¶¶ 7, 8, 22, 38.) In addition, Raytheon asserts that Cray has indirectly infringed its patents by inducing others in this District to use the accused supercomputer or HPC products. (Dkt. No. 1 ¶¶ 7, 8, 23, 39.)

On November 25, 2015, Cray filed a Motion to Dismiss for lack of personal jurisdiction and improper venue. (Dkt. No. 21.) Raytheon responded that at the time of Cray's Motion to Dismiss, one of Cray's sales executives, Mr. Douglas Harless, had been working for Cray from within this District for over seven years. (Dkt. No. 22 at 7–8.) Mr. Harless's responsibilities at

Cray included "new sales and new account development in [the] Central U.S." as well as "management of key accounts within the Financial, BioMedical and Petroleum Industries." *Id.*

In addition, Cray sold an accused XC40 supercomputer to the University of Texas System. (Dkt. No. 21 at 4.) While the accused system was delivered and installed at the University of Texas's Austin campus, the system was accessed via remote terminals at various University of Texas facilities, including two campuses within the Eastern District of Texas. (Dkt. No. 21 at 4; Dkt. No. 1 ¶ 7.) Based on these facts, Magistrate Judge Roy S. Payne found that venue was proper in the Eastern District of Texas, under *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990), and that the exercise of personal jurisdiction was appropriate. (Dkt. No. 65.) The Court adopted this recommendation. (Dkt. No. 94.)

Discovery following the Magistrate Judge's Report and Recommendation revealed additional, relevant information regarding Cray's involvement in the Eastern District of Texas. (Dkt. No. 265 at 8–10.)[1] For example, in a map of Cray's "Americas Sales Territories," Cray specifically identified Athens, Texas, and listed Mr. Harless as the "Named Account Manager" located there. (Dkt. No. 265, Ex. C at 2.) In addition, Mr. Harless's "office" telephone number,

---

[1] Cray failed to meet its discovery obligations in this case. The Court's Discovery Order requires parties to, "without awaiting a discovery request," "produce or permit the inspection of all documents, electronically stored information, and tangible things in the possession, custody, or control of the party that are relevant to the pleaded claims or defenses involved in this action." (Dkt. No. 28 ¶ 3(b).) Cray not only failed to disclose several relevant documents while briefing the original Motion to Dismiss under § 1406, but has also failed to disclose documents contradicting Cray's assertions in the current Motion at issue before this Court. (Dkt. Nos. 21, 25, 69, 256). *See also* (Dkt. No. 265, Stringfield Decl. ¶¶ 4–8) (noting that Cray did not produce several documents related to venue until "after venue briefing closed on December 18, 2015, after the Court issued its Report and Recommendation on June 29, 2016, after the parties briefed Cray's objection to the Court's Report and Recommendation, and after Judge Gilstrap adopted the Court's Report and Recommendation on September 23, 2016"). For example, one of Cray's declarations states that "Cray's employee records indicate that, of [Cray's] employees, only a single employee—Douglas Harless—resides in the Eastern District of Texas." However, independent outside research by Raytheon revealed that from 2010 to 2011, Mr. Troy Testa resided in and worked for Cray as a senior territory manager within the Eastern District of Texas. (Dkt. No. 265, Stringfield Decl. ¶ 2.) Even Cray's 30(b)(6) designee acknowledged the existence of relevant, unproduced documents. One example of these documents is an internal Cray document outlining an employee's sales territory. (Dkt. No. 265, Ex. G at 154:4–159:22) ("Q. Compensation plan? A. Yes. In compensation plans, we outline [an employee's] territory or their assignments. Q. Where would Mr. Harliss's [sic] compensation plan be maintained? A. I believe it's in Seattle, online in Seattle with our human resources department.").

which is listed on Cray's invoices to customers and emails to clients, has an area code associated with several counties in this District. (Dkt. No. 265 at 4; Dkt No. 265, Springfield Decl. ¶¶ 6–7.) Mr. Harless has been identified as the account manager for at least twenty-one separate sales of the accused products to nine different customers. (Dkt No. 265, Springfield Decl. ¶¶ 8–9.) The revenue for the accused sales attributed to Mr. Harless exceeds $345 million. *Id.* In addition to receiving a salary for his sales activities at Cray, Mr. Harless received reimbursement for (1) his cell phone used for business purposes; (2) Internet fees; and (3) mileage or other costs for business travel. (Dkt. No. 265 at 6; Dkt. No. 256, Hoelzeman Decl. ¶¶ 4–5.) Although Cray did not pay for any secretarial or support staff, Mr. Harless received direct "administrative support" from Cray's Minnesota office such that Mr. Harless could continue to work from his home office. (Dkt. No. 256, Hoelzeman Decl. ¶ 5.) Under this arrangement, Mr. Harless was able to sell products to customers both within Texas and across the nation. At the time the Complaint was filed, Mr. Harless's job responsibilities also extended beyond sales, including the management of key accounts within the financial, biomedical, and petroleum industries. (Dkt. No. 22 at 7–8.)

As Cray eventually disclosed, Mr. Harless was not Cray's only employee within the Eastern District of Texas. From 2010 to 2011, Cray employed Mr. Troy Testa as a "Sr. Territory Manager." (Dkt No. 265, Springfield Decl. ¶ 2.) Like Mr. Harless, Mr. Testa resided in this District and sold Cray's HPC systems. *Id.* ¶¶ 2–3. Mr. Testa "[s]old [a] $132,000 system at [a] 41% margin" within three months of joining Cray; "[c]losed six new customers in [his] first year[,] including Areva, Amgen and Weir Oil;" and "[h]ad a pipeline of over $6,000,000 on a $2,500,000 quota" for Cray, all while he resided in the Eastern District of Texas. *Id.*

On June 1, 2017, three months before trial, Cray filed a motion to transfer this case under 28 U.S.C. §1406(a) in light of the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods*

3

*Grp. Brands LLC*, 137 S. Ct. 1514 (2017). (Dkt. No. 256.) Cray asserts that venue is improper because (1) Cray does not "reside" in this District; and (2) Cray has not committed acts of infringement and does not have a regular and established place of business within this District. (Dkt. No. 256.)

## II.   LEGAL STANDARD

### A.  Establishing Venue Under § 1400(b)

"Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b) (2012); *TC Heartland*, 137 S. Ct. at 1519 ("§ 1400(b) 'is the sole and exclusive provision controlling venue in patent infringement actions.'" (quoting *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 229 (1957))).  If venue is not proper, a defendant may move to dismiss the case or transfer it to a district in which the case could have been originally brought.  Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406(a).

Under the general venue statute, which defines residency "[f]or all venue purposes," a domestic corporation resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction." 28 U.S.C. § 1391(c). However, the Supreme Court has held that this statute is inapplicable in patent infringement cases. *TC Heartland*, 137 S. Ct. 1514 at 1519.

While § 1400(b) does not define the word "resides," the Supreme Court in *Fourco Glass Co. v. Transmirra Products Corp.* concluded that, under § 1400(b), a domestic corporation resides only in its state of incorporation. 353 U.S. at 226; *TC Heartland*, 137 S. Ct. at 1521.

Even if a domestic corporation does not reside in the district in which the case is filed, venue remains proper if the domestic corporation has committed acts of infringement and has a regular and established place of business within the district. 28 U.S.C. § 1400(b).

4

### B.  The Burden of Proof When Defendant Objects to Venue

Circuit courts[2], district courts[3], and scholars[4] have reached different answers in allocating the burden of proof in venue disputes. Even courts in this District have rendered conflicting opinions. *Compare Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003) ("[T]he burden of sustaining venue lies with the plaintiff."), *with Sanders v. Seal Fleet, Inc.*, 998 F. Supp. 729, 733 (E.D. Tex. 1998) ("The burden to demonstrate why venue is improper and why the forum should be changed lies with the movant."), *and Texas Marine & Brokerage, Inc. v. Euton*, 120 F. Supp. 2d 611, 612 (E.D. Tex. 2000) (same). The Fifth Circuit also has yet to determine which party bears the burden of proof on a motion regarding improper venue. *See Gupta v. Lynch*, 2014 WL 4063831, at *2 (E.D. La. Aug. 15, 2014) (noting that "district courts in the Fifth Circuit have been inconsistent in allocating the burden of proof" in venue disputes).

Some courts have held that the burden to establish proper venue lies with the plaintiff. Where the burden of sustaining venue is placed on the plaintiff, courts often rely on older authority recognizing a plaintiff's burden in establishing jurisdictional facts. For example, *Langton* cited an earlier case from the Southern District of Texas, *see Langton*, 282 F. Supp. 2d at 508 (citing *Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D. Tex. 2002)), that in turn relied

---

[2] *Compare Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982) (concluding that a defendant bears the burden to establish venue because "'[I]t is not necessary for the plaintiff to include allegations showing the venue to be proper.'"), *with Bartholomew v. Virginia Chiropractors Ass'n, Inc.*, 612 F.2d 812, 816 (4th Cir. 1979) ("[T]he burden is upon plaintiff to establish venue and jurisdiction."), *abrogated on other grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982).

[3] *Compare Dudash v. Varnell Struck & Assocs., Inc.*, No. C 04-2478 MHP, 2004 WL 2623903, at *2 (N.D. Cal. Nov. 16, 2004) ("[T]he burden to prove venue is generally and properly placed on defendant, as the doctrine protects defendant's privilege to avoid litigation in inconvenient forums."), *with Ambriz v. Coca Cola Company*, 2014 WL 296159, at *2 (N.D. Cal. Jan. 27, 2014) ("Plaintiff bears the burden of establishing venue, and all reasonable inferences and factual conflicts are resolved in plaintiff's favor.").

[4] *Compare* 17 Moore's Federal Practice–Civil § 110.01 ("Once the defendant timely objects to venue, courts of appeals generally, and correctly, treat the venue question as an affirmative defense. Therefore, the defendant has the burden of establishing that venue is improper."), *with* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3826 (4th ed. 2017) ("[T]he weight of judicial authority appears to be that when the defendant has made a proper objection, the burden is on the plaintiff to establish that the chosen district is a proper venue.").

5

on a line of cases extending back to *K. J. Schwartzbaum, Inc. v. Evans, Inc.*, 44 F.R.D. 589 (S.D.N.Y. 1968), which recognized that "the burden is on plaintiff to establish the jurisdiction of the court over . . . defendants."  44 F.R.D. at 591. *See also Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1410 (Fed. Cir. 1996) (noting that "venue is based on the facts alleged in the well-pleaded complaint").

However, many other courts have reached the opposite conclusion and hold that the defendant bears the burden to establish improper venue. These courts reason that requiring plaintiffs to establish proper venue confuses the relationship between jurisdiction and venue. *See, e.g.*, *Myers v. American Dental Association*, 695 F.2d 716, 724 (3d Cir. 1982) ("[T]hese cases confuse jurisdiction with venue or offer no reasons to support their position"), *cert. denied*, 462 U.S. 1106 (1983). A motion to dismiss for improper venue is not an attack on the power of the court to hear a particular case. *Myers*, 695 F.2d at 724 ("[A] motion to dismiss for improper venue is not an attack on jurisdiction but only an affirmative dilatory defense."). Instead, it is purely an affirmative defense that reflects considerations of convenience. *See Panhandle E. Pipe Line Co. v. Fed. Power Comm'n*, 324 U.S. 635, 639 (1945) ("Venue relates to the convenience of litigants."). *See also Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) (concluding that the right to object to venue is a "privilege" afforded to defendants that must be "asserted . . . seasonably"). Thus, courts have reasoned that because a plaintiff need not plead venue facts, the plaintiff should not bear the burden to establish proper venue. *Myers*, 695 F.2d 716, 724 (3d Cir. 1982) ("'[I]t is not necessary . . . for the plaintiff to include allegations showing the venue to be proper.' . . . It logically follows therefore that on a motion for dismissal for improper venue under Rule 12 the movant has the burden of proving the affirmative defense asserted by it." (quoting Fed. R. Civ. P. Form 2, Advisory Committee note 3)).

6

This Court declines to hold whether the burden of proof, in asserting venue, lies with the plaintiff or the defendant. In the matter before the Court, the Parties have not disputed who bears this burden. However, even if the burden lies with the plaintiff, the Court finds that Raytheon has met that burden based on the facts alleged in the complaint and the evidence raised by Raytheon during discovery.

### C.  When the Regular and Established Place of Business Must be Considered

Few courts have considered the proper time period for assessing whether a defendant has a regular and established place of business in the district, but each one has reached the same conclusion: "under the patent venue statute, venue is properly lodged in the district if the defendant had a regular and established place of business at the time the cause of action accrued and suit is filed within a reasonable time thereafter." *Welch Sci. Co. v. Human Eng'g Inst., Inc.*, 416 F.2d 32, 35 (7th Cir. 1969), *cert. denied*, 396 U.S. 1003 (1970). *See also San Shoe Trading Corp. v. Converse Inc.*, 649 F. Supp. 341, 345 (S.D.N.Y. 1986); *Datascope Corp. v. SMEC, Inc.*, 561 F. Supp. 787, 789 (D.N.J. 1983), *aff'd in relevant part*, 776 F.2d 320 (Fed. Cir. 1985).  The Court adopts this view.

## III.    ANALYSIS

The Court begins by examining both prongs of § 1400(b): (1) where the defendant resides; and (2) where the defendant has committed acts of infringement and has a regular and established place of business.

### A.  Residence

In patent infringement cases, a domestic corporation "resides" only in its state of incorporation. *Fourco*, 353 U.S. at 226. As a domestic corporation, Cray is incorporated in the State of Washington. (Dkt. No. 1 ¶ 2; Dkt. No. 256 at 4.) Accordingly, Cray does not reside in this District within the meaning of § 1400(b).

### B. The Judicial District Where the Defendant Has Committed Acts of Infringement and Has a Regular and Established Place of Business

Having found that Cray does not reside within the Eastern District of Texas, the Court now considers whether "the defendant has committed acts of infringement and has a regular and established place of business" in the Eastern District of Texas. 28 U.S.C. § 1400(b).

#### i.  Acts of Infringement

Although the statute uses the phrase "act of infringement," courts have "consistently held that an *allegation* of infringement is itself sufficient to establish venue and [the] plaintiff is not required to demonstrate actual infringement by [the] defendant[]." *Funnelcap, Inc. v. Orion Indus., Inc.*, 392 F. Supp. 938, 943 (D. Del. 1975) (emphasis added). Under 35 U.S.C. § 271, an "act of infringement" includes making, using, offering to sell, or selling a patented invention, or inducing such conduct.  Thus, an allegation that a defendant has committed one of those acts in the district is sufficient to satisfy this requirement of the venue statute.[5]

Cray argues: (1) the sale of an accused XC40 supercomputer to the University of Texas was not an "act of infringement" within the Eastern District of Texas because the system was delivered and installed at the University of Texas's Austin campus; and (2) Mr. Harless did not commit acts of infringement because Mr. Harless did not make sales or offers to sell to customers in the Eastern District of Texas.

##### 1.  Induced infringement through use of the University of Texas's XC40 supercomputer

Cray argues that venue is improper in this District because it has not directly or indirectly infringed the Asserted Patents here (or anywhere else). However, the question of whether Cray's

---

[5] The Court recognizes that under Federal Rule of Civil Procedure 12(b)(6), all allegations are subject to a separate and distinct inquiry as to plausibility under the *Iqbal/Twombly* framework. With the plausibility inquiry being a separate issue, the Court does not conduct such analysis here.

conduct infringes the accused products is an ultimate question on the merits, not one that can, or should, be decided on a motion to dismiss for improper venue. *See Astute Tech., LLC v. Learners Digest Int'l LLC*, No. 2:12-CV-689-WCB, 2014 WL 12596468, at *5 (E.D. Tex. Apr. 28, 2014) (Bryson, J.). Accordingly, the Court will not address, at this point, whether Cray induced infringement of the Asserted Patents. Rather, the Court will accept Raytheon's allegation that Cray induced users in this District to infringe the Asserted Patents. That conduct is sufficient to constitute an "act of infringement" under § 1400(b). *See Funnelcap*, 392 F. Supp. at 943.

Further, Raytheon asserts that Cray "knew, or should have known, that the accused XC40 [supercomputer] was installed to be used at various University of Texas facilities, including facilities within this District." (Dkt. No. 22 at 13.) In response, Cray argues that the accused XC40 supercomputer was sold to the Texas Advanced Computer Center ("TACC"), which is located on the University of Texas, Austin campus. (Dkt. No. 21 at 4.) However, Cray does not deny that it knew that the accused XC40 supercomputer would be used by the entire university system, including users at campuses within this District. (Dkt. No. 65 at 5.) The TACC has a website that lists "Cray" and the "UT System" as "partners" of the TACC. (Dkt. No. 65 at 5–6, Dkt. No. 22-34, Ex. 33 at 4 n.1.) In fact, a press release discussing TACC's "relationship with Cray" noted that the accused XC40 supercomputer "will primarily support UT Austin but its user base will extend to the UT system and its research institutions as well as partners at Texas A&M and Texas Tech." (Dkt. No. 22-34, Ex. 33 at 4 n.1.)[6] Furthermore, even though Cray contends that the accused system was sold to the TACC, the TACC's webpage itself states:

> Lonestar 5 [the accused XC40 supercomputer] is designed for academic researchers in Austin and ***across Texas***. It will continue to serve as the primary high performance computing resource in the University of Texas Research

---

[6] The University of Texas System encompasses fourteen institutions across Texas, including the University of Texas at Tyler and the University of Texas Health Science Center at Tyler, both of which are located in this District. Moreover, Texas A&M has a campus in Texarkana, which is also within this District.

Cyberinfrastructure (UTRC) initiative, **sponsored by The University of Texas System**, as well as partner institutions Texas Tech and Texas A&M.

(Dkt. No. 22-34, Ex. 33 at 4 n.1) (emphases added). The evidence cited demonstrates that Cray's conduct and relationship with the University of Texas System, which includes established locations in this District, is sufficient to constitute an act of induced infringement within the District for purposes of venue.

          2.   Mr. Harless's offers to sell while residing in the Eastern District of Texas

Cray also asserts that Mr. Harless's "offers to sell" the accused products while working in this District are not acts of infringement because he did not make any offers to customers within this District. (Dkt. No. 256 at 10–11.) However, Cray's "offers to sell" are not limited to the location of where an HPC product might ultimately be installed—especially where the buyer is a university system comprised of multiple locations and intends all parts of the system to use and enjoy the product or service purchased.

In *W.S. Tyler Co. v. Ludlow-Saylor Wire Co.*, 236 U.S. 723 (1915), the Supreme Court held that a sale, solicited in New York but "consummated" in St. Louis, "did not constitute an infringement . . . within the [Southern District of New York] where suit was brought." 236 U.S. at 724. However, long after *Tyler* was decided, Congress broadened acts of infringement to include "offers to sell . . . any patented invention." 35 U.S.C. § 271(a); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000). While *Tyler* remains applicable law, the *Tyler* Court's holding does not address or extend to the "offer to sell" context.

The Federal Circuit's only guidance regarding the location of an offer to sell has been in the context of determining whether an offer to sell occurred *within the United States*. *See, e.g., Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1309 (Fed. Cir. 2010). In *Transocean*, the Circuit was presented with the question of whether sales

from a foreign country to the United States were sales "within the United States." *Id.* at 1308. The Court emphasized the presumption against extraterritoriality and held that "[t]he focus should not be on the location of the offer, but rather the location of the future sale that would occur pursuant to the offer." *Id.* at 1309. *See also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1378 (Fed. Cir. 2016). These cases were decided squarely within the context of foreign sales, so they offer incomplete guidance regarding purely domestic sales, where the presumption against extraterritoriality is inapplicable. *See id.* ("We are mindful of the presumption against extraterritoriality."). In this case, the alleged "offers to sell" are between domestic entities, and accordingly, the presumption against extraterritoriality does not apply. (Dkt. No. 265, Ex. F.)

Instead, this Court recognizes that an offer to sell, like a sale, has both a physical and a conceptual dimension, and accordingly, an offer to sell may occur at the location of the buyer, the seller, or "points along the shipment route in between." *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) ("The difficulty in answering this question is that unlike the 'making' and the 'using' of an infringing article, which as purely physical occurrences are relatively straightforward to place, the 'selling' of an infringing article has both a physical and a conceptual dimension to it."). *See also Halo*, 831 F.3d at 1377 ("[U]nder *North American Philips*, a sale may occur at multiple locations, including the location of the buyer, for purposes of personal jurisdiction.").

Mr. Harless has made multiple "offers to sell" within the Eastern District of Texas while working for Cray. (Dkt. No. 265 at 4.) Mr. Harless has been identified as the account manager for at least twenty-one separate sales of the accused products to nine different customers. (Dkt. No. 265, Springfield Decl. ¶¶ 8–9.) The revenue for the accused sales attributed to Mr. Harless while he was working in and from this District exceeds $345 million. *Id.* Cray argues that Mr. Harless

could not have offered to sell these products from his home because "each Cray sale is vetted by multiple technical teams at Cray before an offer for sale is made," and all of Cray's offers "originate from Cray's corporate office in Minnesota." (Dkt. No. 256 at 8; Dkt. No. 256, Morreale Decl. ¶¶ 3–5.) However, Mr. Harless's price quotations to his customers include the date of the quotation, the expiration date for the quotation, a description of the product sold, the quoted price, the account executive of the sale, and a section that indicates who prepared the quotation. (Dkt. No. 265, Ex. E.) Mr. Harless is listed as the account executive of the potential customer and the representative who prepared the quotation. *Id.* In addition, Mr. Harless's "903" office telephone number and his email are listed in the "Quotation prepared by" section of the quotation. *Id.* Mr. Harless, on behalf of Cray, communicated a manifestation of willingness to enter into a bargain through the price quotations he sent to potential customers. *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (holding that an "offer to sell" occurs when one "communicate[s] a manifestation of willingness to enter into a bargain, so as made as to justify another person in understanding that his assent to that bargain is invited and will conclude it"). Mr. Harless's price quotations are "offers to sell" on behalf of Cray. *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998) ("As a matter of federal statutory construction, the price quotation letters can be regarded as 'offer[s] to sell' under § 271 based on the substance conveyed in the letters, *i.e.*, a description of the allegedly infringing merchandise and the price at which it can be purchased.").

Accordingly, because Raytheon alleges Mr. Harless made offers to sell within the Eastern District of Texas while he was working for Cray, Mr. Harless's offers to sell are considered acts of infringement. It goes without saying that Mr. Harless profited by his sales, as to his reputation

within the ranks of Cray's employees and the furtherance of his career. He would surely dispute that these were sales from Minnesota and not his own.

*Tyler* also leaves unanswered whether the patent venue statute requires a defendant's "acts of infringement" to be related to the defendant's regular and established place of business. The Federal Circuit has also never addressed this question. Some courts, before 1982, held that there must be some "reasonable or significant relationship between the accused item and any regular and established place of business of the accused in the judicial district." *See Scaramucci v. FMC Corp.*, 258 F. Supp. 598, 602 (W.D. Okla. 1966); *Jeffrey Galion, Inc. v. Joy Mfg. Co.*, 323 F. Supp. 261, 266–67 (N.D. W. Va. 1971). Other courts, however, have reached the opposite conclusion, holding that "the regular and established place of business need not be the business connected with the alleged patent infringement." *Ferguson v. Ford Motor Co.*, 77 F. Supp. 425, 436 (S.D.N.Y. 1948). As one court explained:

> Nothing in the language of Section 1400(b) justifies the conclusion that a defendant's place of business in the district must have some connection with the accused device. The statute requires only that the defendant have committed acts of infringement in the district and have a regular and established place of business there; there is no requirement that the two factors be related.

*Am. Can Co. v. Crown Cork & Seal Co.*, 433 F. Supp. 333, 336 (E.D. Wis. 1977) (quoting *Bourns, Inc. v. Allen-Bradley Co.*, 173 U.S.P.Q. 567, 568 (N.D. Ill. 1971)). *See also Chadeloid Chem. Co. v. Chicago Wood Finishing Co.*, 180 F. 770, 771 (C.C.S.D.N.Y. 1910) (Hand, J.) ("Even if they committed no act of infringement there, it would still be a place of business within the act, which clearly differentiates between the two.").

The Fifth Circuit addressed this issue in *Gaddis v. Calgon Corp.*, 449 F.2d 1318 (5th Cir. 1971), concluding that such a connection was unnecessary and that it was error to "require[e] a showing that the particular *division* [of the business] charged with the infringements had a regular

and established place of business present in the District." 449 F.2d at 1320. The Fifth Circuit instead held that the totality of the circumstances together "add[ed] up to enough to establish venue." *Id.* at 1320.  While this Court considers it proper to follow the courts that have held that the statute creates no relationship between the act of infringement and the regular and established place of business, the Parties in this case do not dispute whether Mr. Harless's offers to sell are related to Cray's regular and established place of business in the Eastern District of Texas. Accordingly, the Court declines to act on this question at this time.

*ii.   Regular and Established Place of Business*

Section 1400(b) also does not define what constitutes "a regular and established place of business."  Moreover, in light of *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990), *abrogated by TC Heartland*, No. 16-341, 2017 WL 2216934, which minimized reliance on the "regular and established place of business" prong, there is little in the way of case law developing a definition.[7] Before *VE Holding*, most courts had developed competing and conflicting interpretations of § 1400(b). *See Lace v. Lace*, No. 89 C 0414, 1989 WL 103364, at *2 (N.D. Ill. 1989) ("We can discern nothing even remotely approximating a uniform approach in the case law to the problem of . . . [what] constitute[s] a 'regular and established place of business . . . .'"); *Johnston v. IVAC Corp.*, 681 F. Supp. 959, 962 (D. Mass. 1987) ("A greater uniformity of interpretation is expected to appear now that the Federal Circuit Court of Appeals [exists] . . . .").

---

[7] *See, e.g., In the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 750 F. Supp. 330, 333 (N.D. Ill. 1990) ("I need not decide this difficult question [of whether a defendant has an established place of business in the district], because [*VE Holding*] holds that for purposes of § 1400(b) 'the judicial district where the defendant resides' includes every place in which a corporation 'is subject to personal jurisdiction at the time the action is commenced.'"); *VE Holding*, 917 F.2d at 1580 n.17 ("It can be argued that by reading § 1391(c) into § 1400(b), the second test under § 1400(b) becomes superfluous and thus meaningless.").

One line of cases held, or at least suggested, that an established *place* of business required a *physical* presence in the district. *See, e.g., Holub Indus., Inc. v. Wyche*, 290 F.2d 852, 854 (4th Cir. 1961); *Gen. Radio Co. v. Superior Elec. Co.*, 293 F.2d 949, 951 (1st Cir. 1961); *Phillips v. Baker*, 121 F.2d 752, 756 (9th Cir. 1941); *Warner-Lambert Co. v. C.B. Fleet Co.*, 583 F. Supp. 519, 522 (D.N.J. 1984) (discussing this line of cases); *Coleco Indus., Inc. v. Kransco Mfg., Inc.*, 247 F. Supp. 571, 574 (S.D.N.Y. 1965). Some courts also required this physical presence to be land the defendant owned, leased, or controlled. *Johnston*, 681 F. Supp. at 962. Others required the physical presence to be a "substantial part" of a defendant's business. *Compare Mastantuono v. Jacobsen Manufacturing Co.*, 184 F. Supp. 178 (S.D.N.Y.1960), *with Coleco*, 247 F. Supp. at 575.

Another line of cases found venue proper even where the defendant lacked a physical presence in the district. *See, e.g., Brunswick Corp. v. Suzuki Motor Co.*, 575 F. Supp. 1412, 1424 (E.D. Wis. 1983) ("This court does not lack venue over U.S. Suzuki simply because it rents no real estate in Wisconsin."); *Instrumentation Specialties Co. v. Waters Assocs., Inc.*, No. 76 C 4340, 1977 WL 22810, at *6 (N.D. Ill. Oct. 12, 1977) (emphasis on physical presence "invite[s] gamesmanship to avoid venue").  These cases often focused on whether a defendant's employee, operating out of his or her home, could constitute a "regular and established place of business." *See, e.g., Shelter-Lite, Inc. v. Reeves Bros.*, 356 F. Supp. 189, 195 (N.D. Ohio 1973) ("[A]n unyielding rule that a regular and established place of business cannot arise by virtue of a salesman operating out of his residence is at odds with the practicalities and necessities of the business community."). The Federal Circuit resolved these competing authorities in *In re Cordis Corp.*, 769 F.2d 733 (Fed. Cir. 1985).[8]

---

[8] Since 1985, the Federal Circuit has not otherwise directly addressed this question. Since then, the realities of American commerce have evolved and changed dramatically.

1. Venue is proper under *In re Cordis*

In *Cordis*, a Minnesota corporation sued a Florida corporation for patent infringement relating to the sale of implantable heart pacemakers. *Id.* at 734. Cordis, the defendant, filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3), alleging that it did not have a "regular and established place of business" in Minnesota. *Id.* The defendant employed two full-time sales representatives, each based in Minnesota. *Id.* at 735. Both employees were paid a salary plus commission and worked exclusively for the defendant, which supplied them with a company owned car. *Id.* In addition, the defendant engaged a Minnesota secretarial service to receive messages, provide typing services, mail Cordis literature, and receive shipments of Cordis sales literature. *Id.* The representatives' business cards listed the telephone number of the Minnesota secretarial service, and phone calls to the number were answered "Cordis Corporation." *Id.* Furthermore, the two employees stored Cordis literature, documents, and products in their home offices. *Id.* Although Cordis was not registered to do business in Minnesota and did not own or lease property in the state, the accused products could be ordered directly from the Florida office or through a Minnesota sales representative. *Id.* In addition to sales, the two Cordis representatives also acted as technical consultants and were present in the operating room during a significant number of surgical implantations, provided post-implantation consultations, and gave presentations regarding technological developments. *Id.*

Based on these facts, the Federal Circuit denied Cordis's petition for a writ of mandamus. *Id.* at 734. It ultimately concluded that "the appropriate inquiry is whether the corporate defendant does its business in that district through a permanent and continuous presence there and not . . . whether it has a fixed physical presence in the sense of a formal office or store." *Cordis*, 769 F.2d at 737.

16

The facts in the present case closely parallel the facts in *Cordis*. At the time this case was filed, Mr. Harless worked exclusively for Cray as a sales executive in this District. (Dkt. No. 22-36, Ex. 35). *Cf. Tyler*, 236 U.S. at 725 (finding that there was no regular and established place of business where the representative was also employed by another corporation which paid for the lease from which he maintained an office as representative of both corporations). Mr. Harless had been working full-time for Cray from within the Eastern District of Texas for over seven years. (Dkt. No. 22 at 7–8.) Cray paid Mr. Harless a salary and maintained Mr. Harless's compensation plan online through its human resources department, which outlined his territory and assignments. (Dkt. No. 256, Hoelzeman Decl. ¶¶ 4–5; Dkt. No. 265, Ex. G at 158:11–159:22.) In fact, a Cray presentation titled "Mid Years Sales Planning" illustrates a map of Cray's "Americas Sales Territories," which identifies Athens, Texas, and lists Mr. Harless as a "Named Account Manager" at that location. (Dkt. No. 265, Stringfield Decl. ¶¶ 4–5.)

Although Cray did not supply Mr. Harless with a company owned car, Mr. Harless received reimbursement for his cell phone used for business purposes, internet fees, and mileage or other costs for business travel. (Dkt. No. 265 at 6; Dkt. No. 256, Hoelzeman Decl. ¶¶ 4–5.) Cray provided Mr. Harless with "administrative support" from Cray's Minnesota office such that Mr. Harless could continue working from his office in the Eastern District of Texas. (Dkt. No. 256, Hoelzeman Decl. ¶ 5.) Under this arrangement, Mr. Harless contacted and sold products to customers using an "office" telephone number with an Eastern District of Texas area code. (Dkt. No. 265 at 4; Dkt. No. 265, Springfield Decl. ¶¶ 6–7.) Invoices to Mr. Harless's customers included his name and his telephone number. *Id.*; (Dkt. No. 265, Ex. E.) In addition, Mr. Harless included his Eastern District of Texas office number in a sales proposal to one of Cray's prospective customers. (Dkt. No. 265, Ex. D.)

While Mr. Harless did not have samples or products stored at his home, Cray admits that Mr. Harless could not do so because "the accused systems take up entire rooms and weigh thousands of pounds." (Dkt. No. 256 at 8.) *See Brunswick Corp. v. Suzuki Motor Co.*, 575 F. Supp. 1412, 1424 (E.D. Wis. 1983) (finding that venue was proper where the defendant's employees "essentially work[ed] out of their homes" and where "the size and bulk of the product [was] such that it [was] economically unsound for the defendant to maintain fixed office space or warehouse facilities"). Instead, salespeople, including Mr. Harless, have access to online sales brochures that they can distribute to prospective customers. (Dkt. No. 265, Ex. G at 167:15–17.) Cray employees are directed to provide the brochures to "customers who are interested or prospects who are interested." (*Id.* at 167:8–17.)

Furthermore, like the representatives in *Cordis*, Mr. Harless's activities within the Eastern District of Texas were not limited to sales. Mr. Harless was responsible for new account development in the Central U.S. and key account management in the financial, biomedical, and petroleum industries. (Dkt. No. 22 at 7–8.) These facts distinguish this case from *Tyler*, where the representative was also employed by another corporation, had his wages apportioned between the two companies, and had authority only "to solicit orders and forward them when received to the home office for execution." *Tyler*, 236 U.S. at 725; (Dkt. No. 274 at 4.) Cray's oversimplified conclusion that *Tyler* "precludes a finding that a remote employee with a private residence meets the [regular and established place of business] standard" contravenes the Federal Circuit's holding in *Cordis*. (Dkt. No. 274 at 4.) *See Cordis*, 769 F.2d at 737.

The activities performed by Cray in this Court's view are factually similar to the activities performed by the representatives in *Cordis* and therefore are sufficient to meet the "regular and established place of business" requirement of § 1400(b).

18

2. Factors pertaining to regular and established place of business in the modern era

Since the Supreme Court's decision in *TC Heartland*, this Court has received a number of motions to dismiss or transfer based on improper venue. It is evident from these motions, and their subsequent briefing, that there is uncertainty among the litigants regarding the scope of the phrase "regular and established place of business." As a result, litigants have cited numerous cases, each of which seems to employ a different analysis as to whether a regular and established place of business exists in a particular case. The Court has also received a number of requests for venue related discovery. Litigants have further expressed uncertainty regarding the appropriate scope of such venue discovery.

For the benefit of such litigants and their counsel, the Court has conducted a thorough analysis of the existing case law regarding regular and established place of business. Courts before and after *Cordis* relied on a variety of detailed factual inquiries to determine whether a defendant has a regular and established place of business in a particular district. After reviewing the "jumbled" and "irreconcilable" case law, one frustrated court noted: "We can discern nothing even remotely approximating a uniform approach in the case law to the problem of whether the activities of an employee (or employees) operating out of a home office constitute a 'regular and established place of business' . . . Nor can we discern any clear trend in the law over time or in the wake of *Cordis*." *Lace v. Lace*, No. 89 C 0414, 1989 WL 103364, at *2 (N.D. Ill. Aug. 28, 1989).

What should be a relatively simple inquiry often evolved into an exploratory examination of a defendant's behavior. *See, e.g.*, *Hemstreet v. Caere Corp.*, No. 90 C 377, 1990 WL 77920, at *2 (N.D. Ill. June 6, 1990) (identifying over a dozen factors considered by courts). For example, some courts (prompted by the parties, no doubt) would delve into minute details such as whether an employee took a tax deduction on her personal income tax return for using her home as a

19

business office. *See, e.g.*, *Herbert v. Diagnostic Prod. Corp.*, No. 85 CIV. 0856, 1986 WL 6781, at *2 (S.D.N.Y. June 10, 1986). This Court finds such factual minutia inappropriate. Such encourages both gamesmanship, as well as excessive and costly venue discovery. This ultimately amounts to a distraction from the merits of the case. As the Supreme Court's recent admonition in *Hertz Corp. v. Friend* makes clear, administration of a threshold statute such as a venue statute should remain "as simple as possible." 559 U.S. 77, 80 (2010).

In *Hertz*, the Supreme Court addressed the circuit courts' various interpretations of the phrase "principal place of business" within the meaning of the federal diversity jurisdiction statute, 28 U.S.C. § 1332(c)(1). *Id.* As with the various interpretations of regular and established place of business, the differing tests utilized by courts grew into a complex universe of disconnected data points applied differently between circuits, and even by courts within a single circuit. *See id.* at 90–92. In short, such a complicated inquiry was "at war with administrative simplicity." *Id.* at 92. Thus, the Court reviewed the tests and data points considered by the lower courts and developed an inquiry that was "relatively easier to apply" although "not a test that will, in all instances, automatically generate a result." *Id.* at 96. Though the Court recognized that there would still be "hard cases," such as cases involving telecommuting via the Internet, the Court emphasized that the narrowed inquiry would at least "point[] courts in a single direction." *Id.* at 95–96.

The Supreme Court's focus on administrative simplicity in *Hertz* is compelling in the venue context. Seeking to follow such a mandate, this Court now attempts to provide guideposts to point the venue analysis in a single coherent direction. The Court recognizes, however, that the precision attained in *Hertz* is not as easily attained in this context, especially given the ever-changing nature of today's businesses and commercial methods. Moreover, "[t]he forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they

20

say today might be obsolete tomorrow." *Packingham v. North Carolina*, No. 15-1194, 2017 WL 2621313, at \*5 (U.S. June 19, 2017). Understanding this reality, it remains important to focus on a tailored set of factors promoting administrative simplicity, but remaining flexible enough to encompass future developments in technology. While these factors are not intended to supplant the statutory language, the Court views these factors as "a framework for the factual inquiry needed to ascertain coverage under the statutory scheme." *See Hall v. Dep't of Treasury*, 264 F.3d 1050, 1056 (Fed. Cir. 2001).

This opinion also takes into account that since the Federal Circuit's 1985 decision in *Cordis*, technology continues to refashion the commercial world. Technology has revolutionized the way businesses operate and the way consumers interact with those businesses. Indeed, we are now "coming to the realization that the Cyber Age is a revolution of historic proportions." *Packingham v. North Carolina*, No. 15-1194, 2017 WL 2621313, at \*5 (U.S. June 19, 2017). This important shift has been recognized by many courts. There are countless examples where courts have interpreted the law in light of changing technology. *See id.* at \*5 ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace . . . ."); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (suggesting an approach to analyzing the effect of a company's website on personal jurisdiction). Courts have also taken this practical approach when interpreting statutes. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (interpreting the abstract idea exception to the patentable subject matter statute in the context of computer-implemented methods); *In re Link_A_Media*

*Devices Corp.*, 662 F.3d 1221, 1224 (Fed. Cir. 2011) (applying Third Circuit law and noting that "advances in technology may alter the weight" given to the factors used in the 28 U.S.C. § 1404 convenience analysis). Regardless of the area of law, a consistent theme among courts is that the technological advances that foster growth and advancement in today's business world cannot be ignored. With this theme in mind, the Court turns to the issue before it.

The following factors, gleaned from prior courts and adapted to apply in the modern era, serve two purposes. First, they focus the regular and established place of business analysis such that parties may address only the relevant facts of the case and avoid costly and far-flung venue discovery, wherever possible. Second, while promoting administrative simplicity, they nonetheless encompass the flexibility earlier courts found appropriate when interpreting the statutory text in light of diverse business structures and practices which evolve with advances in technology. In sum, these guideposts are intended to provide a tailored "totality of the circumstances" approach to venue, guided by the important goal of administrative simplicity.

*Factor One: Physical Presence*

First, the Court considers the extent to which a defendant has a physical presence in the district, including but not limited to property, inventory, infrastructure, or people. At the most basic level, a retail store, warehouse, or other facility in the district weighs strongly in favor of finding a regular and established place of business. However, as many courts have reasoned, including the Court in *Cordis*, the lack of a physical building in the district is not dispositive. *Cordis*, 769 F.2d at 737. *See also Instrumentation Specialties Co. v. Waters Assocs., Inc.*, No. 76 C 4340, 1977 WL 22810, at *6 (N.D. Ill. Oct. 12, 1977) ("We find it hard to believe that 'a regular and established place of business' is to be read so narrowly as to require some fixed physical location which can be said to be the regular and established place of business contemplated by § 1400(b). As the facts

22

of this case indicate, such an interpretation would invite gamesmanship to avoid venue . . . ."); *Shelter-Lite, Inc. v. Reeves Bros.*, 356 F. Supp. 189, 195 (N.D. Ohio 1973) ("[A]n unyielding rule that a regular and established place of business cannot arise by virtue of a salesman operating out of his residence is at odds with the practicalities and necessities of the business community."). Consistent with the reasoning of these earlier courts, this Court is persuaded that a fixed physical location in the district is not a prerequisite to proper venue. However, such a presence is a persuasive factor for courts to consider.

Other forms of physical presence may also help support a finding of a regular and established place of business, such as inventory or property in the district. *See Hemstreet v. Caere Corp.*, No. 90 C 377, 1990 WL 77920, at *2 (N.D. Ill. June 6, 1990) (considering "whether inventory, demonstration equipment, or other property of the defendant corporation is kept within the district"). Facts supporting a physical presence could also include the presence of equipment or infrastructure that is owned (or leased) by a defendant and used to provide services to customers. Additionally, courts have considered the presence of employees[9] in the district when determining whether a defendant has a regular and established place of business. *See Cordis*, 769 F.2d at 735. The Court is persuaded that any such type of physical presence in the district favors a finding that a defendant has a regular and established place of business in the district.

---

[9] Although the Court uses the term "employees" here, the Court does not believe that technical distinctions as to the type of employment relationship are relevant. *See Sherman Paper Prod. Corp. v. Sorg Paper Co.*, 161 F. Supp. 44, 45 (E.D. Mich. 1958) ("The nature of the employment relationship between it and its agent is not a significant difference upon which to base or deny venue.") Drawing such a technical distinction invites gamesmanship and would require the court and the parties to waste substantial resources on determining whether the facts surrounding a particular employee support a conclusion that he or she is an employee, an independent contractor, an agent, or otherwise. This type of inquiry should be avoided, as it is a potentially dangerous distraction from the underlying merits of the case. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims.").

*Factor Two: Defendant's Representations*

Second, the Court looks at the extent to which a defendant represents, internally or externally, that it has a presence in the district. This factor reiterates the central inquiry regarding regular and established place of business articulated by Judge Learned Hand in the early days of patent law. *See Chadeloid Chem. Co. v. Chicago Wood Finishing Co.*, 180 F. 770, 771 (C.C.S.D.N.Y. 1910). In *Chadeloid Chemical*, Judge Hand reasoned:

> The question is whether the defendant had accepted [the representative's] office as a place of business of their own—of such business as they might wish to do in the East. . . . In the face of their own advertisements, and of the representations that they allowed [the representative] to make, that he was their Eastern agent, they cannot with a good grace now deny that they had any business in the East at all, merely because most of their sales were concluded [elsewhere].

180 F. at 771. In that case, Judge Hand found that the defendant had accepted a New York representative's office as one of its own places of business based on, among other things, the advertising that defendant permitted regarding that location and the fact that the defendant naturally expected customer inquiries to be directed toward its agent there.[10] Such representations weigh in favor of finding that a defendant has a regular and established place of business in a district.

*Factor Three: Benefits Received*

Third, the Court considers the extent to which a defendant derives benefits from its presence in the district, including but not limited to sales revenue. Courts have often looked to the benefits a defendant has received from its business in a particular district as a factor supporting a regular and established place of business, especially where a defendant has generated significant

---

[10] Similar facts exist in the case currently before the Court. Here, an internal presentation regarding Cray's Mid-Year Sales Planning featured Mr. Harless as a Named Account Manager based in Athens, Texas. (Dkt. No. 265-4, Ex. C.) As in *Chadeloid*, the evidence demonstrates that Cray has accepted this office as a place of business of its own. This type of evidence, although not necessarily dispositive, can support the conclusion that a defendant has a regular and established place of business in a particular district.

revenue from such business. *See, e.g.*, *Instrumentation Specialties Co. v. Waters Assocs., Inc.*, No. 76 C 4340, 1977 WL 22810, at *6 (N.D. Ill. Oct. 12, 1977) (noting that the defendant had made "substantial annual sales" in the district).

*Factor Four: Targeted Interactions with the District*

Finally, the Court looks at the extent to which a defendant interacts in a targeted way with existing or potential customers, consumers, users, or entities within a district, including but not limited to through localized customer support, ongoing contractual relationships, or targeted marketing efforts. For example, in *Cordis*, the defendant's employees in the district also served as "technical consultants" who were present in the operating room during many surgeries involving the defendant's product. *Cordis*, 769 F.2d at 735. Likewise, a defendant's ongoing contractual relationships with customers in a district may be some evidence that a defendant maintains an established and continuous presence in the district. For example, in the context of personal jurisdiction,[11] the Sixth Circuit looked to a defendant's ongoing contractual relationship with a company in the forum state to support the conclusion that the exercise of personal jurisdiction was appropriate. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264–65 (6th Cir. 1996). In *CompuServ*, the court emphasized that the defendant entered into "ongoing" contracts, governed by the law of the forum state, with a company based in the forum state. *Id.* Although such contractual relationships are not dispositive, they weigh in favor of finding that a defendant has a regular and established place of business in the district. In other contexts, a defendant may seek to promote its

---

[11] Although certain cases relied on by the Court pertain to a specific personal jurisdiction analysis, the Court emphasizes that the factors identified in such cases are not adequate alone to establish a regular and established place of business. Indeed, the Court agrees that "the regular and established place of business standard requires more than the minimum contacts necessary for establishing personal jurisdiction or for satisfying the 'doing business' standard of the general venue provision, 28 U.S.C. § 1391(c)." *LoganTree LP v. Garmin International, Inc.*, 5:17-cv-98-FB (W.D. Tex. June 22, 2017). However, being mindful that venue and jurisdiction are different inquiries, the Court recognizes that certain considerations may be relevant to both a personal jurisdiction analysis and a proper venue analysis.

brand strength and business goodwill by targeting particular communities in the district, with or without generating concurrent revenue. Such efforts may include localized marketing or sponsorships intended to promote the business. Many domestic corporations budget annual expenditures for "business development," and the use of these funds within a particular district may be a reasonable area of inquiry. These types of localized customer interactions (through whatever means) weigh in favor of a finding that a defendant has a regular and established place of business in a district.

None of these factors should alone be dispositive, and other realities present in individual cases should likewise be considered. Courts should endeavor to determine whether a domestic business enterprise seeks to materially further its commercial goals within a specific district through ways and means that are ongoing and continuous. Such a conclusion should be driven by a fair consideration of the totality of the circumstances, and not by the siren call of bright line rules or an overt attachment to form.

## IV.   CONCLUSION

Having considered the case law and the facts leading to the Federal Circuit's opinion in *Cordis*, the Court finds that venue is proper in this case within the Eastern District of Texas.[12] Cray has committed acts of infringement and has a regular and established place of business in this District. Technological advances have significantly changed the way businesses operate throughout our nation, and true to Moore's Law, such exponential progression will continue to expand and evolve. As a result, our courts should employ analytical methods for establishing patent venue which are rooted in the wisdom of the past, but which also embrace the future's

---

[12] The precise posture of this case, as being only three months away from trial, while known to the Court does not impact this result or the analysis leading to it.

26

changes. The above factors are included for such purposes.[13] For the reasons stated above, the

Court hereby **DENIES** Cray's Motion to Transfer Venue Pursuant to § 1406 (Dkt. No. 265).

    **So ORDERED and SIGNED this 29th day of June, 2017.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[13] Acknowledging that the Parties in this case did not have the benefit of the guideposts discussed above, and further recognizing that the holding in *Cordis* is alone adequate to support the result herein, the Court declines to expressly apply the factors above in this particular case; although, the Court is satisfied that had it done so, the result would remain the same.